E-FILED
Tuesday, 15 January, 2019 01:05:59 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

DONNELLY JACKSON and ASHLEY BURRELL,

Plaintiffs,

v.

CITY OF BLOOMINGTON, BRADLEY MASSEY, AARON VEERMAN, TYREL KLEIN, and JUSTIN SHIVELY,

Defendants.

Case No. 17-cv-1046-JES-JEH

# ORDER AND OPINION

Now before the Court is Defendants' *Daubert* Motion to Bar Opinions of Lehman Papet (Doc. 64). Plaintiffs have filed a Response (Doc. 67). No hearing on the matter is necessary. For the reasons that follow, Defendants' *Daubert* Motion is DENIED.

## BACKGROUND

On January 7, 2016, in Bloomington, Illinois, Ashley Burrell was pulled over by Officer Massey for allegedly failing to make a complete stop at a stop sign. Doc. 48, p. 4. Her passenger, Donnelly Jackson, loudly protested the stop as pretextual. Ms. Burrell stepped out of the car to discuss the citation with Officer Massey, and Mr. Jackson continued to yell protests from the passenger seat of the car. *Id.* at 5. Police brought a canine unit to the scene to conduct a free-air sniff for drugs while Officer Massey processed a traffic citation for Ms. Burrell. Officers removed Mr. Jackson from the car in order to conduct the canine sniff. *Id.* at 6–7. The circumstances of Mr. Jackson's removal are irrelevant for the purposes of resolving the present Motion. When the car was empty, Officer Shively brought a certified police dog named Lex to

the car and circled the car with him. According to Officer Shively, Lex alerted to the odor of narcotics on the passenger side of the car. *Id.* at 10. Plaintiffs claim any alert was false: either falsely claimed or falsely produced by Officer Shively. Doc. 1, p. 6. Officers searched the car and did not find any narcotics. Doc. 48, p. 10. Both Ms. Burrell's traffic citation and Mr. Jackson's charge for Resisting a Peace Officer terminated in orders of *nolle prosequi* in McLean County. *Id.* at 11.

Relevant to this Motion are Counts IV and V of the Complaint, in which Plaintiffs allege that Officer Shively did not have any legal justification to search the car, and that the City of Bloomington maintains practices, policies, and customs of prompting false alerts from canines, improperly training canines, failing to report police misconduct, and failing to adequately train, supervise, and discipline police officers. Doc. 1, p. 7. Plaintiffs further assert that the City of Bloomington has failed to correct behaviors and policies exhibited by Officer Shively and Lex specifically, following the Seventh Circuit opinion in *Bentley* that stated, among other things, "This giftee policy seems like a terrible way to promote accurate detection on the part of a service animal, lending credence to [Defendant's] argument that Lex's alert is more of a pretext for a search than an objective basis for probable cause." *United States v. Bentley*, 795 F.3d 630, 636 (7th Cir. 2015) (nevertheless upholding the district court's finding that Lex was reliable enough to support a probable cause determination, together with the other circumstances in that case). Plaintiffs claim that Bloomington's inaction in the face of occurrences like the *Bentley* decision "indirectly authorize the type of misconduct Plaintiffs complain of herein." Doc. 1, p. 8.

Defendants have filed a Motion for Summary Judgment (Doc. 48) in which they claim Lex's certification and training show him to be reliable, and the positive identification on the vehicle by a certified narcotics detection dog sufficed to form probable cause. Doc. 48, pp. 26–

27. Plaintiffs filed a response contesting Lex's reliability, Officer Shively's training, and Bloomington's policies, citing the report of Mr. Lehman "Gene" Papet. Doc. 50, p. 6. Mr. Papet's opinions are the subject of this *Daubert* challenge.

Mr. Papet is the executive director of K9 Resources, LLC. Doc. 64, Exh. 2, p. 9. Mr. Papet has about 30 years of experience training dogs, including narcotics-sniffing dogs, and he has donated "probably 10, maybe 12" dogs to law enforcement departments for scent work. *Id.* at pp. 51, 56. Defendants assert that Mr. Papet's opinions do not meet the requirements of Federal Rule of Evidence 702, primarily because Mr. Papet is a private trainer rather than a police officer, a police department dog trainer, or a member of the various police associations that focus on dog training. Doc. 64, p. 2. Defendants also claim that Mr. Papet's opinions lack "any scientific foundation at all." *Id.* at p. 4. In sum, Defendants claim Mr. Papet's opinions are neither relevant nor reliable, and move to bar his opinions from trial and from the Court's consideration of Defendants' Motion for Summary Judgment (Doc. 48). Plaintiffs hold that Mr. Papet's extensive experience in dog training (including training law enforcement dogs in multiple states), together with his numerous publications in the field, suffice to form a reliable foundation for relevant opinions about Lex's training, Shively's training, and Bloomington's policies. Doc. 67, p. 2. This Order follows.

## **LEGAL STANDARD**

Rule 702 authorizes an expert witness—qualified by their knowledge, skill, experience, training, or education—to present opinion testimony if the testimony will help the trier of fact understand the evidence or determine a fact in issue, as long as the testimony is based on sufficient data, using reliable methods, and the expert has applied the principles reliably to the facts of the case. Fed. R. Evid. 702. Although Rule 702 was updated in 2000, *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), continues to be "the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). *Daubert* requires the Court to evaluate "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original); *see also Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). The party seeking to introduce the expert testimony must meet the *Daubert* standard by a preponderance of the evidence. *Krik v. Exxon Mobil Corp*., 870 F.3d 669, 673 (7th Cir. 2017). *Daubert* centered on scientific evidence, but all expert testimony (including that based on technical or other specialized knowledge) is subject to a *Daubert*-type inquiry, seeking to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 152 (1999).

The factors listed in *Daubert* itself may or may not be relevant to a given case. They are non-exhaustive and include whether a method has been tested, whether a theory or technique has been subject to peer review and publication, any known or potential error rates in a technique, and general acceptance within a scientific community. *Daubert*, 509 U.S. at 593–95. Other factors courts may use in *Daubert* analysis include:

> "(6) whether the testimony relates to 'matters growing naturally and directly out of research they have conducted independent of the litigation,' or developed 'expressly for the purposes of testifying'; (7) '[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'; … (9) '[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting'; and (10) '[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.'"

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–45 (7th Cir. 2005) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment).

The Supreme Court has supported the use of a fact or expert witness to challenge a drug-sniffing dog's reliability, suggesting that such a witness might contest the adequacy of the dog's training, the dog or handler's performance in the field, and the circumstances surrounding a particular alert. *Florida v. Harris*, 568 U.S. 237, 247 (2013). Although there is little guidance on which factors courts should use to evaluate the reliability of an expert *who is in turn evaluating the reliability* of the dog, the handler, and their training, the crux of the analysis remains on the expert's qualifications, the reliability of the expert's methods, and the relevance of the expert's opinions. *See Gopalratnam*, 877 F.3d at 779 (7th Cir. 2017). The Court will therefore examine each of these in turn.

## DISCUSSION

### I. Qualifications

When determining whether a potential expert witness is properly qualified, courts "should consider a proposed expert's full range of practical experience as well as academic or technical training." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Furthermore, "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 Advisory Committee Note.

Mr. Papet has been training law enforcement canines since the 1980s. Doc. 64, Exh. 1, p. 65. More than 50 of his dogs have been certified for drug-sniffing use by police and by organizations such as Law Enforcement Training Specialists. Doc. 67, pp. 3–4. Mr. Papet has

worked closely with the Warren County Sheriff's Office in Ohio, the Clermont County Sheriff's Office in Ohio, and the Mississippi State Highway Patrol, together their K9 units. *Id.* at 4. He has edited a textbook on canine olfaction, and he has published numerous articles on the subject, including in peer-reviewed journals. *Id.* Plaintiff submitted affidavits from two former officers in K9 units who expressed that they highly respect Mr. Papet's expertise and in fact altered their departments' own training policies according to his advice after working with him. Doc. 67, Exhs. 2, 6. He has trained both police dogs and police handlers, and he regularly reviews new literature on the subject of canine detection and training. *Id.*; Doc. 64, Exh. 2, p. 55.

Defendants move to bar his testimony because, among other reasons, they say he is not qualified. They correctly note that Mr. Papet did not finish high school, never received a college degree, and has never been a police officer or police administrator. Doc. 64, p. 6. They also refer to Mr. Papet's lack of qualification by a state as an official police dog trainer, and his lack of membership in three police canine organizations. *Id.* With regard to his practical experience, Defendants say "As [his] 'experience' appears to be self-taught and self-monitored, little to no value can be put upon that experience. Doing something your own way, and perhaps even the wrong way, for a multitude of years does not qualify you as an expert on that task." *Id.* at 7. Defendants' arguments fail for a number of reasons.

First, Defendants' emphasis of Mr. Papet's lack of formal education is misplaced. "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The very nature of the Rule, by listing "knowledge, skill, experience, training *or* education" as independently sufficient grounds for expert qualification, distinctly suggests that a person who has decades of experience or unusual skill in an area may be qualified as an expert in that area regardless of

their educational background. Here, Mr. Papet is clearly being offered as an expert in the training and handling of narcotics detection dogs. His decades of experience in training narcotics detection dogs, hand-in-hand with law enforcement, clearly suggest that he is qualified to opine on that subject, despite his lack of formal education.

Second, while Mr. Papet has never been a police officer nor a law enforcement administrator, Defendants' assertion that "[a]ny opinions by Papet regarding or relating to police work, record keeping, administration, policy or procedures are not reliable [and] are not supported by any specialized knowledge" is not quite accurate. Doc. 64, p. 6. Mr. Papet was employed as a limited "special deputy" by an Ohio sheriff's office for six years, mostly training dogs for bomb detection, and has worked alongside police departments in training narcotics detection dogs for many years. He might not have as deep an insight into police procedures as a K9 officer, but he certainly has specialized knowledge about training law enforcement canines. The affidavits from Mr. DeCamp and Mr. McFadden indicate that some law enforcement personnel have relied on his opinions and learned from him in forming their own policies, which would be hard to fathom if he did not have some expertise on the subject. *See* Doc. 67, Exhs. 2, 6. Mr. Papet's lack of membership in a police dog association likewise does not alter the breadth of his experience.[1]

Third, Defendants claim that Mr. Papet's experience should be discounted because it was "self-taught and self-monitored," making it possible that he has always been training dogs "the wrong way." Doc. 64, p. 7. But Mr. Papet has trained more than 50 dogs that have been certified by law enforcement organizations, and he has donated at least 10 dogs to police departments

[1] Additionally, a co-founder of the National Narcotic Detector Dog Association stated under penalty of perjury that "I have learned a lot from Mr. Papet that I have tried to instill in handlers that I am instructing. … Mr. Gene Papet and K9 Resources are second to none in their training and detection capability." Doc. 67, Exh. 6, p. 2.

himself. Far from being self-monitored, he worked as a special deputy to a sheriff's office for years, his dogs were routinely evaluated by outside parties *including police departments*, and his research on dogs and forensics has been published in peer-reviewed journals five times. *See* Doc. 64, Exh. 1, pp. 65–66. His long-running private business training dogs and his repeated collaborations with law enforcement in multiple jurisdictions suggest that he is, in fact, training dogs properly. Based on his significant experience in the training of dogs for both private and law enforcement use, Mr. Papet does have specialized knowledge on the matter of narcotics detection dogs and their handling. Defendants may cross-examine Mr. Papet and attack his credibility with their own expert, and they may move to limit Mr. Papet's testimony to those matters on which he is qualified in a motion *in limine*, but these are not matters before the Court today.

**II. Reliability**

Defendants criticize Mr. Papet's opinions as unreliable because of the above-mentioned lack of education and lack of personal experience as a police officer or police administrator. This is unavailing for the same reasons listed above; Mr. Papet's personal experience qualifies him as an expert, not his education. His background in training police dogs and handlers suffices to give him specialized knowledge in the area. Defendants also claim that Mr. Papet's report is "rife with arbitrary and unsupported contentions," stating that the report is not "scientific" and is instead "based upon his alleged knowledge and experience in the areas he addresses." Doc. 64, pp. 3, 10. This argument is quickly resolved, as expert reports may of course be based on specialized knowledge and experience in the area addressed—experts can and do routinely prepare reports free from mathematics or scientific analysis, including Defendants' own canine expert in this case. Doc. 67, Exh. 5. Defendants' expert report contains no citation to any scholarly source and

no explicit internal methodology of evaluating Mr. Papet's conclusions. *Id.* Instead, like Mr. Papet's report, it contains opinions that a person drew based on the information provided to him and his decades of experience working with dogs in law enforcement. *Id.*

Defendants note that Mr. Papet prepared several charts in his report without showing how he created them.[2] The 68-page report does contain ten diagrams. The first eight are simple visual aids to illustrate the information surrounding them; they are attributed to sources such as Nestlé Purina and K9 Resources. Doc. 64, Exh. 1, pp. 15, 17, 26, 28–29, 32–34. Mr. Papet himself prepared the last two, which appear to be of concern to Defendants. They are entitled "Deployment Alert Analysis" and "Deployment Training Analysis." *Id.* at 58, 62. Defense counsel questioned Mr. Papet about how he prepared these charts in an April 17, 2018 deposition. Doc. 64, Exh. 2. Mr. Papet explained in this deposition that he prepared the charts by using the data provided by the Bloomington Police Department on Lex's alerts and training. Doc. 64, Exh. 2, pp. 118–19. Both charts are accompanied by an explanatory methodology section. As Mr. Papet discussed in his report and in his deposition, the preparation of this diagram required only addition and some division to determine percentages. Doc. 64, Exh. 1, pp. 59–60, 63; Doc. 64, Exh. 2, pp. 121–22. The Court need not belabor an analysis of whether basic mathematics are a generally accepted practice, nor whether experts on training dogs may reliably opine on specific dog training practices. Plaintiffs have clearly shown beyond a preponderance of the evidence that Mr. Papet's methods are sufficiently reliable to survive a *Daubert* challenge.

**III. Relevance**

Plaintiffs must also show by a preponderance of the evidence that Mr. Papet's opinions will help the trier of fact understand the evidence or determine a fact in issue. Fed. R. Evid. 702.

[2] "There is no way to determine if the charts were the product of reliable principles and methods, nor that those principles and methods were applied to the facts of this case." Doc. 64, p. 9.

Plaintiffs have conceded that not every part of Mr. Papet's report is relevant to this case. They maintain that seven of his findings are:

> (1) the Bloomington Police Department canine supervisor has very little oversight and guidance over the Unit, which accounts for the failure of handlers to maintain accurate documents related to canine training and deployment; (2) the Unit fails to have a written policy requiring the microphone be turned on during the deployment of the canine officer, and thus, fails to ensure that the handler does not give his canine any verbal cues to alert, (3) the Unit does not properly maintain initial training records for the canine and handler; (4) the Unit failed to make necessary corrections to its practices after the Bentley decision was rendered, substantiated in part by the decline of the canine's accuracy since Bentley; (5) the Unit has failed to detect health concerns of the canine and has failed to provide proper housing which can affect the canine's reliability; (6) the Unit improperly times, delivers, and administers rewards to the canine that could alter its responses; and (7) the Bloomington Police Department performed their yearly certifications inadequately.

Doc. 67, p. 2.

Plaintiffs' § 1983 wrongful search claim relies heavily on an assertion that the officers did not have probable cause to search the vehicle. Doc. 1, p. 6. Lex's alert formed the basis for probable cause here. See Doc. 48, pp. 26–27 ("[T]he dog was indicating discovery of the odor of narcotics. Accordingly, probable cause for a warrantless search of the vehicle pursuant to the automobile exception existed at the time."). Those challenging a dog's alert "must have an opportunity to challenge … evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing [their] own fact or expert witness." *Florida v. Harris*, 568 U.S. 237, 247 (2013). "And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* Mr. Papet's report bears directly on these issues.[3]

[3] Defendants cite *Florida v. Harris* for the proposition that past training and field performance are irrelevant when detection dogs are certified. Quite to the contrary, that case held that evidence of certification may sufficiently prove the dog reliable only where the reliability of the dog is not challenged. *Harris*, 568 U.S. at 248. For more on this

Furthermore, Plaintiffs' *Monell* claim alleges, among other things, that Bloomington failed to adequately train, supervise, and discipline officers. Doc. 1, p. 7. Mr. Papet's testimony may be of limited value in determining whether the Bloomington policy comports with Illinois state policies, for example, but it is relevant in determining the nature of the existing, published policies. As an experienced trainer of narcotics detection dogs who has worked with multiple law enforcement agencies, he can present his opinion on the Bloomington policies, just as Defendants' Chester County dog training expert can, despite his lack of personal experience in the Bloomington department. Doc. 67, Exh. 5, p. 1. Again, Defendants may challenge Mr. Papet's conclusions through cross-examination and through the presentation of their own expert. Because Mr. Papet's expertise is sufficient to help the trier of fact determine a fact in issue, this Court will not exclude it as irrelevant.

**CONCLUSION**

For the reasons set forth above, Defendants' *Daubert* Motion to Bar Opinions of Lehman Papet (Doc. 64) is DENIED.

Signed on this 15th day of January, 2019.

/s James E. Shadid
James E. Shadid
Chief United States District Judge

---

subject, see Ensminger, John, & Papet, L.E., *Walking Search Warrants: Canine Forensics and Police Culture after* Florida v. Harris, J. ANIMAL & NAT. RESOURCE L. 1 (2014).