UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| DONNELLY JACKSON and ASHLEY BURRELL, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 17-cv-1046-JES-JEH<br>) |
| CITY OF BLOOMINGTON, BRADLEY MASSEY, AARON VEERMAN, TYREL KLEIN, and JUSTIN SHIVELY, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

# <u>ORDER AND OPINION</u>

Now before the Court is Defendants' Motion for Summary Judgment (Doc. 48). Plaintiffs have filed a Response (Doc. 50) and Defendants have filed a Reply (Doc. 66). For the reasons set forth below, Defendants' Motion is DENIED.

### BACKGROUND

**I. Agreed Facts**

The following facts are undisputed by the parties. On January 7, 2016, Plaintiff Ashley Burrell was driving a gray Cadillac with Plaintiff Donnelly Jackson seated in the passenger seat in Bloomington, Illinois. Doc. 48, p. 3; Doc. 50, p. 5. They pulled up to Mr. Jackson's mother's residence, and Ms. Burrell waited in the car while Mr. Jackson briefly went inside for two to three minutes to retrieve a bus pass. Doc. 48, p. 3. When he returned to the car, they drove away. Officer Massey observed the car stopping for a short time in an area he believed was known for drugs, and chose to follow them in his car. Doc. 48, p. 4. At the intersection of Robinhood and Fairway, Officer Massey pulled them over for an alleged stop sign violation. *Id.*

1

When Ms. Burrell stopped the car, Officer Massey approached the driver's side of the car and spoke with her. *Id.* at 5. At some point, Mr. Jackson began loudly protesting the stop, describing it as "bullshit" and racially motivated. *Id.* Officer Massey asked Ms. Burrell to step out of the vehicle and discuss the traffic stop near his squad car. *Id.* Officer Massey told Ms. Burrell he had pulled her over for a stop sign violation. *Id.* Officer Veerman then arrived at the scene and approached the passenger side of the car. *Id.* Mr. Jackson was agitated, loudly arguing that the officers had profiled them based on their race and the kind of car Ms. Burrell was driving. *Id.* He refused to provide an ID to Officer Veerman. *Id.* at 6. Officer Klein then arrived at the scene and approached the car. *Id.* Officer Massey got into his squad car and began drafting Ms. Burrell's traffic citation. *Id.* Meanwhile, Officer Veerman informed Mr. Jackson that he was free to leave the scene, and Mr. Jackson said that he was not going anywhere. *Id.* Officer Veerman learned that K9 Officer Shively was on his way to conduct a free air sniff of the car with a canine. *Id.*

At that point, Officer Veerman requested that Mr. Jackson get out of the car, as the department does not conduct free air sniffs while there are people inside. *Id.* Mr. Jackson initially refused, and asked why he had to get out. *Id.*; Doc. 50, p. 5. Officer Veerman told him he would be arrested if he did not. Doc. 48, p. 7. Officer Veerman believed he had probable cause to arrest Mr. Jackson for Resisting/Obstructing a Police Officer, and grabbed him by the arm around the time he stated "hold on." *Id.*; Doc. 50, p. 5. Officer Klein and Officer Veerman pulled Mr. Jackson out of the car. Doc. 48, p. 7. Mr. Jackson said that he was "not doing anything," and the officers brought him to the ground. *Id.* at 8; Doc. 50, p. 6. Observing this, Officer Massey got out of his squad car and went to join Officers Klein and Veerman. Doc. 48, p. 8. Officer Klein delivered a 2-second drive stun to Mr. Jackson's lower back, and then a second 4-second drive

stun. *Id.* Officer Massey sprayed pepper spray at Mr. Jackson's face. *Id.* After this, officers handcuffed Mr. Jackson. *Id.*

K9 Officer Shively and a narcotics detection police dog named Lex then began a free air sniff of the car. Doc. 48, pp. 9–10. Officer Shively left his microphone in his car while they conducted the free air sniff, and so there is no audio recording of the process. Doc. 66, p. 3. When Officer Shively brought Lex near the passenger's side of the car, he changed his breathing, jumped up and put his feet on the window, and spun when he came back down. Doc. 48 at 10. Eventually Lex scratched at the area, which is his trained "final response." *Id.* Officer Shively informed the other officers that Lex had alerted to the scent of narcotics. *Id.* Officers searched the car and found no narcotics. *Id.*

Mr. Jackson was taken to St. Joseph Emergency Room to be evaluated and then taken to jail for Resisting a Peace Officer. *Id.* at 11. Ms. Burrell was issued a citation for Violation of a Stop Sign and released from the scene. *Id.* On May 9, 2016, Ms. Burrell's traffic charge terminated in an order of *nolle prosequi*. *Id.* On August 2, 2016, Mr. Jackson's misdemeanor charge terminated in an order of *nolle prosequi*.

## II. Disputed Facts

### A. The Stop

Ms. Burrell and Mr. Jackson contend that Ms. Burrell came to a complete stop at the intersection of Riley Drive and Mecherle, and that she stopped behind the stop sign. Doc. 50, p. 5. Defendants, on the other hand, argue that Officer Massey "believed" that the car did not come to a complete stop at the stop sign because he saw the brake lights flash only briefly. Doc. 48, p. 4. Plaintiffs argue that Officer Massey could not have seen the car from his vantage point. Doc. 50, p. 2.

**B. The Use of Force**

Plaintiffs do not dispute that Mr. Jackson initially refused to get out of the car when asked. Doc. 50, p. 2. However, they allege that Mr. Jackson was attempting to get out when he said "hold on," and officers forcibly pulled him out anyway. *Id.* at 5. Although Defendants labeled this allegation "undisputed" in their Reply, they claim Mr. Jackson was not attempting to get out of the car when he said "hold on." Doc. 66, p. 2. According to Defendants, when Jackson refused to get out of the car, Officer Veerman grabbed Mr. Jackson's arm to pull him out of the car, but Mr. Jackson pulled back, so Officer Klein joined Officer Veerman in pulling Mr. Jackson out of the car. Doc. 48, p. 7. Again, Plaintiffs assert that Mr. Jackson was trying to voluntarily get out of the car. Doc. 50, p. 3.

According to Plaintiffs, when Mr. Jackson was out of the car, he put his hands up, and Officer Veerman kicked his left knee out from under him, knocking him to the ground. Doc. 50, p. 3. Mr. Jackson was not pulling away, and his statement that he was "not doing anything" referred to his lack of resistance. *Id.* at 6. To the extent that he "pulled" on the officers, this was a result of his fall to the ground. *Id.* at 3. Once on the ground, Mr. Jackson could not get his hands behind his back because the officers were on top of him and were holding his arms. *Id.* at 3. He told them as much. *Id.* However, while on the ground, with his hands held behind him by officers, Mr. Jackson felt a taser and pepper spray simultaneously. *Id.* at 4. To the extent that his body moved, it was an involuntary response to the pain of the taser. *Id.* He did not physically resist the officers. *Id.* at 6.

According to Defendants, Mr. Jackson was trying to get away from them as they pulled him out of the car. Doc. 48, p. 7. Officers Klein and Veerman brought him to the ground, where he locked his arms under his body. *Id.* at 8. Officer Massey went to help subdue Mr. Jackson, and

4

Mr. Jackson tensed his body and pulled away. *Id.* Officers repeatedly told Mr. Jackson to put his hands behind his back, or he would be tased. *Id.* He failed to do so, and Officer Klein used his taser to deliver a 2-second stun drive to Mr. Jackson's back. *Id.* Mr. Jackson still did not comply, so Officer Klein used the taser for 4 seconds, again on Mr. Jackson's back. *Id.* When Mr. Jackson still did not comply, Officer Massey sprayed pepper spray at Mr. Jackson's face for two seconds. *Id.* Mr. Jackson began yelling and pulling harder, so Officer Massey sprayed him again for 2 seconds. *Id.* After the second spray, Mr. Jackson immediately placed his hands behind his back, and the officers handcuffed him. *Id.*

**C. The Search**

**1. Bloomington K9 Training and Policy**

Officer Shively arrived with his K9 partner Lex, relying on Officer Massey's representation that the stop was valid and reasonable. Doc. 48, p. 9. Plaintiffs contend that although Lex was certified by the Canine Training Institute, the National Police Canine Association, the Midwest Counterdrug Training Center, and the State of Illinois, he was not appropriately trained. Doc. 50, p. 4. Plaintiffs dispute Lex's accuracy and reliability, noting that Lex and Officer Shively were criticized by the Seventh Circuit in *Bentley*. *Id.* at 6; *United States v. Bentley*, 795 F.3d 630, 636 (7th Cir. 2015). Plaintiffs point out that there were no new policies issued after the *Bentley* decision, and Lex's training records after the *Bentley* decision do not show any improvements. Doc. 50, p. 6. In fact, Lex's training records show that his accuracy got worse after *Bentley*. *Id.*, citing Doc. 50, Exh. 7, p. 8. Plaintiffs rely on an expert witness for the assertion that the City of Bloomington's K9 policies lack oversight to identify training issues. *Id.*

Defendants challenged Plaintiffs' expert in a separate *Daubert* motion, which this Court denied on January 15, 2019. Doc. 68. Defendants hold that Lex's accuracy percentage in training

exercises in 2016 was 98.88%, that he was properly trained, and that his satisfactory completion of training and certification programs is sufficient to establish his reliability. Doc. 66, p. 4.

### 2. The Search on January 7, 2016

According to Defendants, Officer Shively arrived shortly after the stop began. Doc. 48, p. 6. When Mr. Jackson got out of the car, Officer Shively brought Lex up to the car and began the free air sniff. *Id.* When they got near the passenger's side door, Lex's breathing changed, he jumped up and put his feet on the front passenger window, "made a big swooping spin," and came back down. *Id.* Officer Shively recognized these behaviors as indications that Lex had smelled narcotics. *Id.* Finally, Lex scratched at the door, which was his trained "final response" when he identified the odor of narcotics. *Id.* This prompted officers to search the car. *Id.*

According to Plaintiffs, Officer Shively did not arrive "shortly," but rather about seven minutes after the initiation of the stop.[1] Doc. 50, p. 2. Lex did demonstrate the behaviors Defendant describes near the car, but not all of them (e.g., a breathing change) are alert behaviors. *Id.* at 4; Doc. 50, Exh. 8, p. 195. Officer Shively cued Lex to give the behaviors that were alerts, and his microphone did not pick up any audible cuing because it was not on him at the time of the free air sniff. Doc. 50, pp. 4, 6.

**D. The Proceeding Charges**

Defendants state simply that orders of *nolle prosequi* terminated the charges against Ms. Burrell and Mr. Jackson. Doc. 48, p. 11. They claim that the officers took no part in the McLean County prosecutor's decision to prosecute the Plaintiffs other than by providing their reports, and that the officers provided no misstatements regarding the Plaintiffs. *Id.* Plaintiffs argue that the

---

[1] This assertion of fact, #20 from Defendants' Motion for Summary Judgment (Doc. 48), is listed in both the "Undisputed Material Facts" section and the "Disputed Material Facts" section of Plaintiffs' Response (Doc. 50). Like Plaintiff's Additional Material Fact #4 (Doc. 50, p. 5), which Defendants contradicted despite labeling it "undisputed" (Doc. 66, p. 2) the Court will treat this fact as disputed.

officers were involved in the commencement of criminal proceedings against them by submitting false arrest reports, particularly with regard to the officers' statements about the initial traffic stop. Doc. 50, p. 4.

## LEGAL STANDARD

Summary judgment is proper where the materials in the record demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The role of the judge in resolving a motion for summary judgment is not to weigh the evidence for its truth but to determine whether sufficient evidence exists that a jury could return a verdict in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Thus, in order to survive a motion for summary judgment, the non-movant must show specific facts that demonstrate the existence of genuine issues for trial. *Id.* The Court will construe the record "in the light most favorable to the non-movant" in deciding whether the case involves genuine issues of fact requiring a trial. *Payne v. Pauley*, 337 F.2d 767, 770 (7th Cir. 2003). However, mere allegations in the complaint by a non-movant plaintiff will not suffice; instead, they must show admissible evidence such as depositions that show genuine disputes of material fact. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## DISCUSSION

Defendants argue that they are entitled to summary judgment on twelve grounds: 1. Officer Massey had probable cause to conduct the traffic stop; 2. Officer Massey is entitled to qualified immunity with respect to the traffic stop; 3. Officers Veerman, Klein, and Massey had probable cause to arrest Mr. Jackson for obstructing a peace officer; 4. Officers Veerman, Klein, and Massey are entitled to qualified immunity for their actions involving Mr. Jackson's arrest; 5. Officers Veerman, Klein, and Massey did not use excessive force; 6. Officers Veerman, Klein,

7

and Massey are entitled to qualified immunity on the excessive force claim; 7. there was probable cause to search the car; 8. Officers Veerman, Klein, Massey, and Shively are entitled to qualified immunity for the search of the car; 9. Plaintiffs have not sufficiently alleged that the City of Bloomington has policies that led to a violation of Plaintiffs' constitutional rights; 10. Plaintiffs have not sufficiently alleged any of the four elements required for a malicious prosecution claim; 11. Plaintiffs' *respondeat superior* claim fails because the malicious prosecution claim is unsupported; 12. Plaintiffs' indemnification claim fails because Plaintiffs cannot recover on any of their claims. The Court will examine these in turn.

**I. The Traffic Stop**

    **A. Probable Cause**

Defendants have alleged that Officer Massey had probable cause to initiate the traffic stop based on his observation that the brake lights flashed "for only an instant" at a stop sign. Doc. 48, pp. 13–14. Defendants argue that Officer Massey reasonably believed a traffic violation had taken place, and that he was thus entitled to stop the Plaintiffs. Doc. 48, p. 13 (citing *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013)). However, Plaintiffs have alleged that Ms. Burrell came to a complete stop at the stop sign, as supported by her deposition, and that Officer Massey could not even see their vehicle when it was at the stop sign. Doc. 50, p. 2. Plaintiffs support this latter assertion with a dashboard camera video from Officer Massey's car, which indeed does not depict Plaintiffs' car at the stop sign in question. Doc. 50, Exh. 2. Defendants argue that this does not contradict their account, because "what Officer Massey could see, or where he was looking, is not depicted upon any video." Doc. 66, p. 6. The Court disagrees. Taking the evidence in the light most favorable to the Plaintiffs, a factual dispute exists as to whether Officer Massey could see their car at the time of the alleged stop sign

8

violation. Since Officer Massey's observations form the entirety of the basis for the traffic stop, and the video arguably contradicts his assertions, summary judgment is not warranted on the issue of whether he had probable cause to stop Plaintiffs' car for the alleged stop sign violation.

**B. Qualified Immunity**

Police officers are indeed entitled to qualified immunity if a reasonable officer in the same circumstances could have reasonably believed there was probable cause, even if that belief was mistaken. *Humphrey v. Staszak*, 148 F.3d 719, 728 (7th Cir. 1998). However, Plaintiffs' version of the facts here, supported by their depositions and by video evidence, is that Officer Massey could not see Plaintiffs' car at the time of the alleged stop sign violation, and that no stop sign violation actually took place. If a fact-finder were to credit the Plaintiffs' version of what happened over Officer Massey's version, then Officer Massey's decision to pull the car over was not based on any observed traffic violation. Thus, no officer in those circumstances would have reasonably believed there was probable cause to pull the car over—the stop was baseless. Summary judgment is thus not warranted on the grounds of Officer Massey's qualified immunity; material disputes of fact remain on the issue of whether he could have reasonably believed he had probable cause to stop the car.

## II. The Use of Force

**A. Probable Cause for the Arrest**

Defendants contend that they had probable cause to arrest Mr. Jackson when he refused to get out of his car and subsequently failed to put his hands behind his back. Doc. 48, p. 18. Plaintiffs agree that Mr. Jackson initially refused to get out of the car, but argue that he was attempting to comply when Officers Veerman and Klein "violently yanked" him out. Doc. 50, p. 10. Mr. Jackson asserted in his deposition that he was trying to pull on his "bad knee" to get

9

out of the car when the officers intervened, and dashboard camera video from Officer Veerman's car shows Mr. Jackson made some kind of motion and said "hold on" to the officers. Doc. 50, Exh. 6, p. 28; Doc. 50, Exh. 5.

First, we address Mr. Jackson's initial refusal to get out of the car. The question for the Court is whether a reasonable officer would believe that brief passive physical resistance and failure to comply with a lawful police order[2] alone constituted probable cause to arrest him for resisting a police officer. *See Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679–80 (7th Cir. 2007) ("If the officer had probable cause to believe that the person he arrested was involved in criminal activity, then a Fourth Amendment claim for false arrest is foreclosed."). Plaintiffs point out multiple cases where verbal argument and refusal to comply with a police order did *not* constitute resisting, as long as it was brief. *See People v. Stoudt*, 555 N.E.2d 825, 828 (Ill.App.Ct. 1990) (defendant's refusal to remove himself from the street was not a physical act of resistance); *Skube v. Williamson*, 2015 WL 890363 (C.D. Ill. 2015) (plaintiff's verbal attempts to make police stop searching her purse did not constitute resisting). Defendants argue that these cases deal with convictions for resisting, not establishing probable cause for the arrest. Doc. 66, p. 14. However, a Court in this district held in *Skube* that "the law is clear—and had been for many years when the events giving rise to this case occurred in July 2011—that a short period of arguing and not complying with police orders does not constitute resisting arrest." *Skube*, at *7. Cited in that case are numerous Illinois appellate cases upholding the proposition that brief refusal to comply with a police order clearly is not resisting arrest. *See, e.g., People v. Weathington*, 411 N.E.2d 862, 863–64 (Ill. 1980) ("No physical act of resistance or obstruction occurred: merely argument coupled with eventual cooperation."); *People v. Berardi*, 948 N.E.2d

---

[2] *See Maryland v. Wilson,* 519 U.S. 408, 414 (1997) (authorizing police officers making traffic stops to order passengers to get out of the car until the stop has concluded).

10

98, 103 (Ill.App.Ct. 2011) ("Defendant's almost immediate acquiescence to [the officer's] authority, once defendant learned that his protestations about the validity of [the officer's] request would be fruitless, adds further proof that defendant was not attempting to 'hinder' or 'delay' [the officer's] performance of his duty."). It is "well settled under Illinois law" that mere argument does not constitute resistance, and taking the facts in the light most favorable to the Plaintiffs, Mr. Jackson's short period of argument followed by attempted compliance did *not* provide probable cause to arrest him for resisting. *See Payne*, 337 F.3d at 776 ("[R]esistance must be physical; mere argument will not suffice.") (citing *Weathington*, 411 N.E.2d at 863–64).

Second, we address Mr. Jackson's alleged failure to put his hands behind his back. Defendants claim that after the officers pulled Mr. Jackson from the vehicle, he "continued to resist by refusing to place his hands behind his back." Doc. 48, p. 17. Plaintiffs contend that as soon as Mr. Jackson was pulled out of the car, Officer Veerman kicked his knee out from under him and he fell to the ground. He then had no control over his arms as officers held both arms while they pepper sprayed and tased him. Doc. 50, pp. 11–12. Squad car video shows that as Mr. Jackson was pulled out of the car, one officer was holding his left arm and one officer was holding his right arm, and that Mr. Jackson quickly fell to the ground. Doc. 48, Exh. 6. Thus, taking the evidence in the light most favorable to Plaintiffs, the officers based their arrest on behavior they physically forced Mr. Jackson into—claiming he failed to put his hands behind his back while they pulled his arms up and away from his body. The Court cannot conclude that, under those circumstances, a reasonable officer would believe that he had probable cause to arrest Mr. Jackson for resisting. *See City of Pekin v. Ross*, 400 N.E.2d 992, 994 (Ill.App.Ct. 1980) (attempting to pull one's arms down because of severe pain during arrest was not resisting) (citing *People v. Flannigan*, 267 N.E.2d 739 (Ill.App.Ct. 1971)). Because a genuine dispute of

11

fact remains on the issue of whether probable cause existed to arrest Mr. Jackson, the Court denies summary judgment on those grounds.

**B. The Use of Force to Effect the Arrest**

To evaluate whether the use of force is excessive, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[3] *Graham v. Connor*, 490 U.S. 386, 396 (1989). This includes considering factors such as how severe the crime at issue was, whether the suspect posed an immediate safety threat, and whether the suspect was actively resisting or attempting to flee. *Id.* When there are disputes of fact regarding what happened, summary judgment in excessive force cases "should be granted sparingly." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The fact-intensive nature of such claims, together with the necessity of weighing conflicting testimony, makes them more appropriate for resolution by a jury. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) ("[W]hen material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety.") (quoting *Bell v. Irwin*, 321 F.3d 627 (7th Cir. 2003)).

---

[3] Plaintiffs argue that *any* force used to effectuate an unlawful arrest is automatically unreasonable, citing *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) and an Eleventh Circuit case. Although there is some support for this contention in the Fourth and Eleventh Circuits (*see Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) ("even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect"); *Bailey v. Kennedy*, 349 F.3d 731, 744 (4th Cir. 2003) ("[W]e have twice confronted situations in which a plaintiff, subjected to police force, had committed no crime; in each, we held that the plaintiff had stated a claim for violation of his constitutional right to be free from excessive police force.")), the Seventh Circuit has expressly separated the inquiry into false arrest from the inquiry into the excessiveness of subsequent use of force. *Carlson v. Bukovic*, 621 F.3d 610, 622 (7th Cir. 2010) (rejecting, as the Third Circuit did, a statement of law that "any amount of force used to effect an arrest without probable cause is *per se* excessive"). Some confusion remains in harmonizing *Herzog* with subsequent cases (*see Irons v. Village of Dolton*, 2017 WL 3872478 (N.D. Ill. Sept. 5, 2017)), but the state of the law in the Seventh Circuit is now that "the lawfulness of an arrest is irrelevant to an excessive force analysis." *Sebright v. City of Rockford*, 585 F. App'x 905, 907 (7th Cir. 2014).

Numerous factual disputes exist involving the use of force. The parties disagree about whether Mr. Jackson was attempting to comply when he was pulled out of the car, whether he was struggling with the officers who pulled him out, whether they kicked his legs out from under him, whether he continued to struggle after he was repeatedly tased, whether he was pepper sprayed at the same time he was tased, and whether he continued to struggle after the first burst of pepper spray. Essentially, all three of the factors set out in *Graham* are disputed: Plaintiffs argue that Mr. Jackson had committed no crime, that he posed no safety risk whatsoever, and that he was not resisting the officers as he endured pepper spray to his face, kicks, and electric shocks. Defendants argue that these facts are not genuinely disputed because the squad car videos of the event clearly contradict Plaintiffs' claims.

The Court may consider video evidence, and in situations where the video evidence refutes the plaintiff's account of the facts, "the court should not accept the plaintiff's story for purposes of summary judgment." *Gillis v. Pollard*, 554 F. App'x 502, 506 (7th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)). However, the video evidence in question here is "open to varying interpretations." *Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018). The video does not clearly contradict Plaintiffs' account of what happened. Officer Massey's squad car video does show Plaintiff raising his arms above his head when he is pulled out of the car, and Officer Veerman's squad car video and audio arguably support Plaintiffs' contention that Mr. Jackson was attempting to comply with orders when he was pulled out. Because the video does not show the ensuing scuffle clearly, and the audio and picture are grainy, the Court cannot conclude that there is no genuine dispute of fact as to whether Mr. Jackson's knee was kicked out from under him, whether he was struggling while pinned under the officers, and in what sequence the pepper spray and taser were used. If a jury were to accept Plaintiffs' account of the

disputed facts, then the use of force could be found unreasonable; all three *Graham* factors would point towards excessiveness if officers kicked, tased, and pepper sprayed a verbally belligerent but unresisting person who had committed no crime. *See, e.g., Abbott*, 705 F.3d at 732 ("[I]t was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting subjects."); *Payne*, 337 F.3d at 780 ("It was also well established that it was unlawful to use excessively tight handcuffs and yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officers or others, and were suspected of committing only minor crimes."); *Phillips v. Community Ins. Corp*, 678 F.3d 513, 525 (7th Cir. 2012) (failing to exit a car after repeated police commands was "passive noncompliance of a different nature than the struggling that we have found warrants escalation of force."). The Court therefore denies summary judgment on the excessive force claim.

**C. Qualified Immunity**

As stated in Section II(A) of this Order, genuine disputes of fact exist as to whether Mr. Jackson's conduct rose to a level establishing probable cause to arrest him for resisting. The law is well-settled that no arguable probable cause would exist if the events took place according to Mr. Jackson's account (*see, e.g., Payne*, 337 F.3d at 776), and so summary judgment is not warranted on qualified immunity grounds with respect to the basis for the arrest.

With respect to the use of force, Defendants argue that, under their version of what happened, the force used by Officers Veerman, Klein, and Massey did not violate any clearly established constitutional rights. However, viewing the evidence in favor of the Plaintiffs, this is not so—the use of a taser and pepper spray is more than a "minimal" amount of force, which is what well-established precedent suggests officers must use when a person is only passively

14

resisting. *See Phillips*, 678 F.3d at 525 ("[W]illful noncompliance was not the same as 'actively resisting,' but instead a passive 'resistance requiring the minimal use of force.'") (quoting *Smith v. Ball State University*, 295 F.3d 763, 771 (7th Cir. 2002)); *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (holding that a taser is not a *de minimis* application of force); *Abbott*, 705 F.3d at 726 (describing both tasers and pepper spray as an "intermediate level of force"). A jury could also construe the initial force used to pull Mr. Jackson out of the car as unreasonable, if they view the video and Mr. Jackson's claims as indicating that he was attempting to comply when they forcibly removed him. The Court therefore denies summary judgment on qualified immunity grounds for the excessive force claim.

### III. The Search

#### A. Probable Cause

To prevail on their claim of an unreasonable search of their vehicle, Plaintiffs must demonstrate that there was no probable cause for the search. *See Holmes*, 511 F.3d at 679–80. Defendants assert that Plaintiffs cannot prevail on this claim because Lex, a trained drug dog, alerted to the presence of drugs, and the squad car video depicts Lex jumping up on the car. Doc. 48, p. 26; Doc. 66, p. 22.

Plaintiffs' version of events—namely, that Officer Shively left his microphone in the car to hide his cuing, and then led Lex around the car, cuing him to alert where Mr. Jackson had been sitting—is not clearly contradicted by the evidence. Whatever his motives, Officer Shively did leave his microphone in his car. He then walked in front of Lex as they circled the car, which Plaintiffs' expert suggests is an improper practice consistent with cuing. Doc. 50, Exh. 7, p. 41. When they reach the passenger side door, the two walk past it once, and then Officer Shively leads Lex past the passenger side door a second time. Doc. 48, Exh. 4. It is impossible to hear

15

whether Officer Shively said anything to Lex. Officer Shively's back is to the video cameras at times, and he makes some movements with his hand that a jury could interpret as cuing gestures. *Id.* This, coupled with Lex's very high alert rate,[4] suggests that Plaintiffs' allegations have more than "absolutely no support." Doc. 66, p. 23. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds there are disputed material facts that preclude summary judgment on the unreasonable search claim.

**B. Qualified Immunity**

If, as Plaintiffs allege, Officer Shively cued Lex to alert, then no reasonable officer would believe that the alert created probable cause to search the vehicle. Because Plaintiffs' expert and the video evidence suggest a genuine dispute of material fact on this issue, summary judgment is denied on qualified immunity grounds as to the unreasonable search claim.

**IV. Plaintiffs' Remaining Claims**

**A. *Monell* Claim**

Plaintiffs allege that an unconstitutional custom, policy, procedure, or practice of the City of Bloomington was "the moving force" behind the unconstitutional search of their car. Doc. 50, p. 21. That is, Plaintiffs claim that Bloomington's failure to establish proper policies on training, documentation, supervision, and oversight created an environment where the K9 unit conducted illegal searches, including the one they experienced. Defendants argue that Plaintiffs have only alleged that one dog might have been trained better and one officer forgot to put on his microphone. Doc. 66, pp. 25–26. However, Plaintiffs' expert in dog training reviewed the Bloomington policies and listed ways in which he claims they fall short, including by failing to retire or retrain dogs like Lex in the wake of *Bentley*. Doc. 50, Exh. 7, pp. 3, 56–57. Taking that

---

[4] In 2015, the Seventh Circuit noted that Lex alerted 93% of the time he was called to conduct a vehicle sniff, a rate that the training company "was embarrassed by." *United States v. Bentley*, 795 F.3d 630, 636 (7th Cir. 2015).

evidence in the light most favorable to Plaintiffs, this is sufficient for their *Monell* claim to survive summary judgment. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) ("[In some circumstances], the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."); *Spalding v. City of Chicago*, 186 F.Supp.3d 884, 916 (N.D. Ill. 2016) (denying summary judgment where expert testimony supported the existence of an unwritten code of silence in a police force).

### B. Malicious Prosecution Claims

Plaintiff Burrell claims that Officer Massey's role in prosecuting her for Disregarding a Stop Sign amounted to malicious prosecution. Plaintiff Jackson claims that all Defendant-Officers maliciously instituted charges against him for Resisting a Peace Officer. Defendants move for summary judgment because they claim that Plaintiffs cannot show four out of the five elements of a malicious prosecution claim: that the Defendants initiated or continued a criminal proceeding, that the proceeding terminated in Plaintiffs' favor, that there was no probable cause for the charges, and that the officers acted with malice. Doc. 48, pp. 31–35. The Court will examine each disputed element in turn.

First, Defendants argue that Plaintiffs have not shown that the officers knowingly made misstatements to the prosecutors in their cases. Doc. 48, p. 31. As explained above, the Plaintiffs have established material disputes of fact as to whether there was probable cause to arrest either of them. If Plaintiffs version of events is correct, then the officers pulled them over without probable cause and then arrested them illegally. The officers' contrary representations in their written reports (which they provided to prosecutors) would suffice to establish the first element.

17

Second, Defendants argue that Plaintiffs can only show that their cases terminated in *nolle prosequi* orders, not that the orders were entered for reasons consistent with innocence. However, Officer Massey testified that he was present at Ms. Burrell's traffic citation hearing, and she was found not guilty after all the evidence was presented, including his testimony that he watched her commit a traffic violation. Doc. 48, Exh. 3, p. 39. Additionally, the *nolle prosequi* order in Mr. Jackson's case was entered after the state court granted his motion to quash his arrest, despite the officers' testimony that they had probable cause to arrest him. Doc. 48, Exh. 4. Neither *nolle prosequi* order was secured as part of an agreement with the accused, which suggests that Plaintiffs have indeed established the second element of their malicious prosecution claims. *See Swick v. Liautaud*, 662 N.E.2d 1238, 1242–43 (Ill. 1996).

Third, Defendants claim that the malicious prosecution claims fail because the Plaintiffs have not shown an absence of probable cause for the relevant proceedings. As explained in sections I(A) and II(A) of this Order, there are genuine disputes of material fact with regard to whether probable cause existed for the traffic citation and for Mr. Jackson's arrest. Accepting the Plaintiffs' version of events, they have established the third element of their malicious prosecution claims.

Fourth, Defendants argue that Plaintiffs have not provided any facts in support of their allegation of the officers' malice. Plaintiffs respond that they have sufficiently alleged malice by showing there was no probable cause and by alleging facts showing that Defendants were not acting on behalf of any legitimate law enforcement interest, instead stopping Ms. Burrell on a false basis and punishing Mr. Jackson for protesting the stop. Doc. 50, p. 25 ("It is clear that the Defendants had no patience with Plaintiff Jackson because he had the audacity to call them out for their illegal traffic stop and search."). Interpreting the facts favorably to Plaintiffs, a

reasonable fact-finder could find that the officers acted out of malice rather than legitimate law enforcement interests or genuine belief that Plaintiffs had committed the acts alleged. The Court thus denies summary judgment on the malicious prosecution claims.

### C. *Respondeat Superior* Claim

Defendants claim that Count VIII fails because the malicious prosecution claims fail. As explained above, the Court denies summary judgment on the malicious prosecution claim, and therefore the *respondeat superior* claim based on the malicious prosecution claim survives summary judgment as well.

### D. Indemnification Claim

Defendants likewise claim that the Court should grant summary judgment on the indemnification claim because Plaintiffs cannot recover on any of their other claims. Because the Court denied summary judgment on the above claims, summary judgment is also denied as to the indemnification claim.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 48) is DENIED.

Signed on this 12th day of February, 2019.

/s James E. Shadid
James E. Shadid
Chief United States District Judge